[Cite as *Melvin v. Ohio State Univ. Med. Ctr.*, 2010-Ohio-3226.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MICHELE A. MELVIN, Admr.

    Plaintiff

    v.

THE OHIO STATE UNIVERSITY MEDICAL CENTER

    Defendant
    Case No. 2007-09135

Judge Joseph T. Clark
Magistrate Anderson M. Renick

MAGISTRATE DECISION

{¶ 1}   Pursuant to Civ.R. 53, Magistrate Anderson M. Renick was appointed to conduct all proceedings necessary for decision in this matter.

{¶ 2}   Plaintiff brought this action on behalf of the estate of the decedent, Joseph W. Wilson, alleging wrongful death.  Plaintiff asserts that Wilson died as a result of peritonitis on December 26, 2006, several days after undergoing a surgical procedure to remove a polyp and the portion of the colon to which it was attached.  According to plaintiff, the peritonitis resulted from a dehiscence, or separation, of the surgical suture which attached the small intestine to  the colon, thus allowing fecal matter to leak into the abdominal cavity.  The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 3}   In the fall of 2006, Wilson's personal physician performed a colonoscopy and discovered a large, potentially cancerous polyp in Wilson's colon.  Due to its size, the polyp could not be removed via colonoscopy and Wilson was therefore referred to

defendant for a surgical evaluation. On November 6, 2006, plaintiff met with Mark Arnold, M.D., a colorectal surgeon employed by defendant.

{¶ 4} Dr. Arnold testified that based upon his evaluation of Wilson, he determined that the polyp required prompt surgical removal inasmuch as its continued growth would ultimately block Wilson's colon. Dr. Arnold stated that although this type of procedure is fairly common and generally carries a low degree of risk, performing it on Wilson presented unique challenges due to the fact that he was a "medically fragile" individual with a host of complicating factors that included congestive heart failure, a prior heart attack, pacemaker dependency, anemia, a prior stroke, diabetes, and poor renal function.

{¶ 5} On December 10, 2006, defendant admitted Wilson for the operation, which was scheduled for the following day. According to Dr. Arnold, patients undergoing an operation of this type are generally admitted during the morning of the procedure, but he arranged for Wilson to arrive earlier so that he could be evaluated and cleared for surgery by a cardiologist. Wilson's cardiology evaluation took longer than anticipated, though, and the operation was therefore rescheduled for December 13, 2006.

{¶ 6} Dr. Arnold testified that in order to minimize the stress on Wilson's heart, he elected to perform a minimally-invasive laparoscopic procedure rather than creating an open incision in Wilson's abdomen. Dr. Arnold described the operation as follows: cameras were inserted into the abdominal cavity through small incisions near the navel; ascites (fluid in the abdominal cavity) was discovered and suctioned away through a slightly larger incision also near the navel; the colon was freed and pulled from the body through the larger incision; the polyp and attached section of the colon were removed; the remaining portion of the colon was sutured to the intestine and placed back inside the abdominal cavity; and, lastly, the incisions were closed.

{¶ 7} Dr. Arnold stated that aside from the large amount of ascites that was discovered in Wilson's abdominal cavity, the operation proceeded as expected and without any complication. According to Dr. Arnold, the ascites was a product of liver failure, which he attributed to the weakened ability of Wilson's heart to deliver oxygen to his liver and other organs.

{¶ 8} Plaintiff, who is Wilson's daughter, testified that Wilson was in good spirits following the operation and that she remained with him through the night. Plaintiff and Alisa Hilderhoff, another daughter of Wilson, testified that during the day after the operation, Wilson's lower body appeared swollen and he complained of generalized pain. Plaintiff and Hilderhoff stated that Wilson endured a slow and difficult recovery over the next several days and that, although he remained alert and showed some signs of recovery such as regaining his appetite, they grew concerned over his continued swelling and his inability to stand or ambulate to the bathroom on his own.

{¶ 9} Hilderhoff also testified that while she was in Wilson's room on December 22, 2006, she observed two nurses "drop" Wilson while attempting to lift him from the commode, whereupon he fell to the floor and defecated. According to Hilderhoff, seven to nine employees spent the next two hours attending to Wilson and cleaning the bathroom.

{¶ 10} Dr. Arnold testified that he was not aware of any such incident and that it was not recorded in Wilson's chart or otherwise documented. Dr. Arnold also stated that Wilson's chart does not show any correlative change in his condition after the purported incident. Additionally, plaintiff testified that a set of notes that she and other family members kept to document Wilson's post-operative care contain no reference to such an incident.

{¶ 11} Dr. Arnold agreed with plaintiff's and Hilderhoff's assessment that Wilson had difficulty recovering from the operation, but he stated that this was to be expected in light of Wilson's congestive heart failure. According to Dr. Arnold, Wilson's weak heart function hindered his body's recovery mechanisms and caused such problems as poor

renal function, swelling in the lower body, and occasional breathing difficulty. Dr. Arnold stated that because of the complexities presented by Wilson's heart problems, he arranged for cardiologists to regularly monitor Wilson throughout his post-operative care. Dr. Arnold further stated that at no time did Wilson present a "clinical picture" consistent with peritonitis.

**{¶ 12}** Dr. Arnold defined peritonitis as an infection of the lining of the abdominal cavity, which, if untreated, may spread to the bloodstream and result in sepsis. According to Dr. Arnold, symptoms of peritonitis generally include fever, tachycardia, tachypnea (rapid breathing), abdominal pain and tenderness, lack of bowel function, nausea, loss of appetite, an elevated white blood cell count, mental status changes, and malaise. Dr. Arnold stated that Wilson exhibited few of these symptoms and that, notably, he lacked key symptoms that are present in nearly every case of peritonitis, such as fever, nausea, and lack of bowel function.

**{¶ 13}** Dr. Arnold acknowledged that some abdominal tenderness was noted in Wilson's chart at times and that he had an elevated white blood cell count through the time of his discharge, but he stated that such symptoms were common side effects of the operation. Dr. Arnold explained that in order to prevent infection, the body normally produces additional white blood cells in response to surgical procedures, and because Wilson was slow to recover from the operation, his white blood cell count remained elevated for a longer period of time than it would have in a healthier patient. Dr. Arnold emphasized that Wilson's white blood cell count nonetheless remained stable, whereas in a patient with peritonitis, the white blood cell count typically "spikes" dramatically upward.

**{¶ 14}** Dr. Arnold testified that although Wilson's recovery was hindered by his congestive heart failure, he nonetheless reached a stable condition several days after the procedure, particularly once he regained his bowel function and appetite and his renal function returned to a level consistent with its pre-operative function. Dr. Arnold

stated that in light of these improvements, he determined that Wilson could be discharged to a nursing facility closer to his home.

{¶ 15} On December 24, 2006, Wilson was discharged to the Heartland of Piqua nursing home in Piqua, Ohio. Plaintiff and Hilderhoff stated that when they visited Wilson at the nursing home that evening, they did not notice any significant changes in his condition. However, on the evening of December 25, 2006, Wilson suddenly complained of abdominal pain and was consequently transported to the Upper Valley Medical Center (UVMC) in Troy, Ohio. At 10:00 p.m. that evening, Wilson was admitted to UVMC where he was seen in the emergency room by Dr. Gregory K. Rodgers.

{¶ 16} Dr. Rodgers testified via deposition that Wilson was alert and conversant upon entering the emergency room and that he was able to discuss his medical history and present condition. Dr. Rodgers testified that Wilson chiefly complained of breathing difficulty and abdominal pain. According to Dr. Rodgers, he was able to improve Wilson's breathing by having him sit upright in bed, and he explained that such an improvement was an indication that Wilson's breathing difficulty was owed to his congestive heart failure.

{¶ 17} Dr. Rodgers testified that in consideration of both Wilson's abdominal pain and his recent operation, he also specifically evaluated Wilson for symptoms of peritonitis, including taking an x-ray of Wilson's abdomen. Dr. Rodgers' examination revealed that Wilson did not exhibit symptoms consistent with peritonitis inasmuch as the x-ray revealed no free air in the abdominal cavity, he did not have a fever, his abdomen was neither tender nor rigid, he had "bowel sounds" indicative of a functioning bowel, and he reported having a bowel movement earlier in the day. Based upon such findings, Dr. Rodgers noted in Wilson's chart that "[t]here is no peritonitis." (Joint Exhibit C.)

{¶ 18} Dr. Rodgers stated that at approximately 2:30 a.m., as he continued to evaluate and converse with Wilson, Wilson's breathing grew labored, his heart rhythm became abnormal, and he soon became unresponsive and suffered cardiac arrest.

According to Dr. Rodgers, emergency room staff attempted to revive Wilson with cardiopulmonary resuscitation and drugs such as epinephrine, but those efforts proved unsuccessful and Wilson was pronounced dead at 2:50 a.m. on December 26, 2006. In Wilson's chart, Dr. Rodgers concluded that the cause of death was unclear, but that "by all measures [Wilson] showed no evidence" of sepsis. (Joint Exhibit C.)

{¶ 19} Dr. Rodgers related that the Miami County Coroner elected to perform an autopsy of Wilson. The autopsy was performed on December 27, 2006, by Lee Lehman, M.D., the Chief Deputy Coroner for the Montgomery County Coroner's office. Dr. Lehman testified via deposition that Miami County contracts with his office in lieu of performing its own autopsies. According to the autopsy report prepared by Dr. Lehman, the autopsy revealed a 2-3 millimeter dehiscence which was "oozing" fecal material at the site where Wilson's intestine and colon were sutured during the operation. Based upon that finding, as well as the presence of "purulent exudate" and "purulent ascites" in the abdominal cavity, Dr. Lehman concluded in his report that the cause of Wilson's death was "acute peritonitis due to surgical wound dehiscence."[1] (Joint Exhibit D.)

{¶ 20} Plaintiff alleges that defendant was negligent in failing "to properly diagnose and/or treat the developing acute peritonitis from which [Wilson] suffered and died." Defendant contends that Wilson's care and treatment at all times met the applicable standard of care and, moreover, that Wilson died of heart failure rather than peritonitis.

{¶ 21} "In order to establish medical [negligence], it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by

---

[1]The court notes that although R.C. 313.19 provides that the cause of death assigned by the coroner shall be "the legally accepted cause of death," the Supreme Court of Ohio has held that the coroner's findings are non-binding and may be rebutted by competent, credible evidence. See *Vargo v. Travelers Inc. Co.* (1987), 34 Ohio St.3d 27, paragraph one of the syllabus.

the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 131.

{¶ 22} "To maintain a wrongful death action on a theory of medical negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 92, citing *Bennison v. Stillpass Transit Co.* (1966), 5 Ohio St.2d 122, paragraph one of the syllabus.

{¶ 23} Defendant's pathology expert, Vincent J. M. Di Maio, M.D., testified by deposition based upon his review of medical records that included the autopsy report, photographs and slides, and Dr. Lehman's deposition.  Dr. Di Maio, whose testimony pertained to the cause of Wilson's death rather than the issue of liability, is board certified in anatomical, clinical, and forensic pathology, and he served as the Chief Medical Examiner for Bexar County, Texas from 1981 to 2006.

{¶ 24} According to Dr. Di Maio, when an individual contracts peritonitis, the contents of the abdominal cavity quickly become coated in a purulent exudate, which he characterized as a "yellow, sticky pus" containing white blood cells that the body produces in order to counteract the infection.  Dr. Di Maio testified that given the nature of the dehiscence that was found in the autopsy, a purulent exudate should have developed within two to three hours after it occurred.  Dr. Di Maio stated, however, that while the autopsy report notes the presence of purulent exudate, the autopsy photographs of Wilson's abdominal cavity do not show such matter.

{¶ 25} Dr. Lehman acknowledged in his deposition that the photographs indeed do not depict purulent exudate, but he explained that the photographs were taken after he had rinsed the abdominal contents with water, thereby removing the purulent

exudate.  According to Dr. Di Maio, however, purulent exudate is adherent such that it could not have been rinsed from the abdominal contents in that manner.

{¶ 26} Dr. Di Maio stated that in addition to purulent exudate, other signs of peritonitis include inflammation at the area of the peritoneal leak and dark ascites.  But, according to Dr. Di Maio, the autopsy photographs do not depict any inflammation near the site of the dehiscence.  Dr. Di Maio further stated that although dark ascites was documented in the autopsy report, that was not necessarily an indication of peritonitis inasmuch as ascites is commonly found in individuals with congestive heart failure and the dark coloration may have resulted from blood that dried in Wilson's abdomen after his operation.  Dr. Di Maio opined that aside from the dehiscence itself, "[t]here is no evidence at all of peritonitis."

{¶ 27} According to Dr. Di Maio, based upon the evidence of heart disease that was documented in the autopsy report, such as severe hardening of the arteries and an enlarged heart, Wilson more likely than not died of congestive heart failure.  Dr. Di Maio further opined that Wilson's surgical dehiscence could not have developed more than two to three hours before his death and that it may have developed as a result of the administration of cardiopulmonary resuscitation at UVMC inasmuch as vigorous resuscitation efforts are capable of damaging intestinal sutures.

{¶ 28} With regard to the treatment that Wilson received while in defendant's care, both parties offered expert testimony.  Plaintiff's expert, Steven Becker, M.D., who is a board-certified general surgeon, testified that surgical dehiscence and peritonitis are well-known risks associated with the type of operation that Wilson underwent and that the symptoms of peritonitis include fever, rebound tenderness in the abdomen, tachycardia, an elevated respiratory rate, an elevated white blood cell count, lack of bowel function, free air in the abdomen, and organ failure.

{¶ 29} Dr. Becker stated that although Wilson demonstrated few, if any, symptoms of peritonitis in the first two days after his operation, a rise in his white blood

cell count on December 16, 2006, suggests that the dehiscence and resulting peritonitis may have begun on or about that date. Dr. Becker stated that Dr. Arnold should have recognized the continued elevation of the white blood cell count, as well as Wilson's poor heart and kidney function, as signs of peritonitis that required further investigation by means of a CT scan or a barium enema. On cross-examination, Dr. Becker acknowledged that Wilson did not exhibit some of the most typical symptoms of peritonitis such as lack of bowel function, rebound tenderness in the abdomen, or free air in the abdomen, but he stated that Wilson nonetheless exhibited other symptoms such that further diagnostic testing should have been performed to detect a peritoneal infection, and he opined that Dr. Arnold's failure to do so fell below the standard of care.

{¶ 30} Defendant's expert, Olaf B. Johansen, M.D., a board-certified general and colorectal surgeon, testified by deposition that peritonitis is a risk associated with procedures such as the one that Wilson underwent, occurring approximately five percent of the time. Dr. Johansen related that symptoms of peritonitis include fever, pain, nausea, tachycardia, widening of pulse pressure, persistent tachypnea, a rigid and tender abdomen, accumulation of air in the abdomen, renal dysfunction, lack of bowel function, a progressively elevating white blood cell count, and changes in mental status.

{¶ 31} Dr. Johansen testified that according to the post-operative medical records generated by defendant, Heartland of Piqua, and UVMC, Wilson did not exhibit tachycardia or tachypnea, his renal function was consistent with its preoperative condition, numerous entries in his chart reflect that his abdomen was not tender and that he complained of very little pain, he ate consistently, he had regular bowel movements, x-rays taken four or five days before he was discharged by defendant showed no free air in the abdomen, x-rays taken at UVMC just hours before his death showed no free air in the abdomen, and his mental status remained consistently alert. Dr. Johansen further testified that although Wilson had a fever immediately following the operation, it was attributable to the stress of the operation and soon dissipated.

{¶ 32} Dr. Johansen similarly stated that while Wilson's white blood cell count was elevated after the operation, that is normal for an individual in a medically fragile condition such as Wilson. Dr. Johansen explained that the body normally produces more white blood cells immediately after a surgical operation in order to prevent infection, and because medically fragile patients such as Wilson are slower to recover from the operation, the white blood cell count remains elevated for a longer period of time. Dr. Johansen explained that Wilson's white blood cell count was not symptomatic of peritonitis because it remained relatively stable at all times following the operation and reached a peak value of only about 16.3, whereas it would have "spiked" upward to a level well above 20 if Wilson had contracted peritonitis. Dr. Johansen emphasized that peritonitis generally results in bacteria entering the bloodstream, but that two blood cultures taken at UVMC shortly before Wilson's death revealed no such bacteria in his bloodstream.

{¶ 33} Thus, according to Dr. Johansen, Wilson did not present symptoms consistent with peritonitis at any time following the operation. Dr. Johansen opined that Dr. Arnold made the appropriate evaluations for detecting peritonitis and at all times met the applicable standard of care. Moreover, Dr. Johansen testified that the photographs taken during Wilson's autopsy are not consistent with peritonitis inasmuch as the surfaces of the abdominal cavity did not appear to be lined with the purulent exudate that develops soon after the onset of peritonitis. Dr. Johansen further testified that the photographs also did not show inflammation of the tissue surrounding the dehiscence, which generally occurs in cases of peritonitis. Dr. Johansen thus opined that the dehiscence "could not have been going on for any length of time" and may have occurred post-mortem.

{¶ 34} Defendant also presented the expert testimony of Alessandro Fichera, M.D., a board-certified general and colorectal surgeon. Dr. Fichera testified by deposition that the symptoms of peritonitis include fever, pain, nausea, tachycardia,

tachypnea, abdominal distension, rebound tenderness in the abdomen, reduced oxygen saturation, an elevated white blood cell count, lack of bowel function, and changes in mental status.

{¶ 35} According to Dr. Fichera, these symptoms would have manifested very quickly if the dehiscence occurred prior to Wilson's death, but he stated that Wilson's medical records do not demonstrate such symptoms.  Dr. Fichera noted in particular that on December 23, 2006, one day before Wilson was discharged to Heartland of Piqua, he did not have a fever, he did not have tachycardia, his respiratory rate was normal, his oxygen saturation was normal, he was alert and oriented, and he had been consistently eating and having bowel movements for several days.  Dr. Fichera testified that according to the records from UVMC, just hours before his death, Wilson's vital signs were normal and it was specifically noted that his abdomen was not tender and that he had bowel sounds.  According to Dr. Fichera, peritoneal infections generally result in bacterial infections in the bloodstream, but two blood cultures taken at UVMC shortly before Wilson expired did not show any such bacteria.

{¶ 36} Dr. Fichera stated that although Wilson's white blood cell count remained consistently elevated postoperatively, white blood cell counts typically elevate in response to the stress of surgical procedures.  Dr. Fichera explained that Wilson's white blood cell count remained elevated for a longer period than that which most patients experience due to Wilson's diminished capacity for coping with the stress of the operation, which Dr. Fichera attributed to congestive heart failure.

{¶ 37} Dr. Fichera testified that based upon the lack of symptoms exhibited by Wilson, and given that a medically fragile patient generally displays immediate and obvious symptoms of peritonitis upon contracting it, the dehiscence that was discovered during the autopsy probably did not develop while Wilson was in defendant's care, and may have occurred during either the resuscitation efforts or the autopsy.  Dr. Fichera testified that Wilson's myriad of health problems added a great deal of complication and risk to his treatment, which exceeded the typical expertise of a colorectal surgeon, and

he opined that Dr. Arnold therefore properly consulted with the appropriate cardiologists and other specialists to evaluate Wilson and manage his care. Dr. Fichera further opined that Dr. Arnold met the standard of care at all times in his treatment of Wilson.

{¶ 38} Upon review of the evidence adduced at trial, the court finds that the treatment of Wilson as provided by Dr. Arnold and defendant's other medical professionals at all times met the accepted standard of care. Specifically, the court finds that Dr. Arnold appropriately determined that Wilson did not exhibit the clinical symptoms of peritonitis following the December 13, 2006 surgical procedure, and that Wilson was properly discharged to Heartland of Piqua on December 23, 2006.

{¶ 39} The experts for each party, as well as Dr. Arnold, described the symptoms of peritonitis similarly. As to whether Wilson exhibited such symptoms while in defendant's care, the court finds the testimony of Drs. Fichera and Johansen to be more persuasive than the opinion offered by Dr. Becker. Dr. Becker acknowledged that Wilson lacked some of the more telling symptoms of peritonitis, but he cited Wilson's white blood cell count as a strong indication of peritonitis which should have prompted further investigation by Dr. Arnold. However, Drs. Fichera and Johansen persuasively testified that the white blood cell count remained within a normal postoperative level for an individual with Wilson's frailties and that, indeed, Wilson did not exhibit symptoms consistent with peritonitis while in defendant's care. Furthermore, although it is undisputed that Wilson had difficulty recovering from the operation, the testimony of Drs. Fichera and Johansen demonstrated that such difficulty resulted from Wilson's congestive heart failure and that, by December 23, 2006, he had recovered and stabilized such that his discharge to Heartland of Piqua on that date was appropriate.

{¶ 40} Based upon the totality of the evidence, the court finds that plaintiff has failed to prove her claim by a preponderance of the evidence. Accordingly, it is recommended that judgment be rendered in favor of defendant.

*A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(I). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ANDERSON M. RENICK
Magistrate

cc:

Daniel R. Forsythe          John E. Fulker
Karl W. Schedler          William J. Fulker
Assistant Attorneys General          12 South Cherry Street
150 East Gay Street, 18th Floor          P.O. Box 8
Columbus, Ohio 43215-3130          Troy, Ohio 45373

RCV/cmd
Filed June 11, 2010
To S.C. reporter July 7, 2010